FILED

2012 Dec-17  AM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JOHN WESLEY BURCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-10-S-2417-NW** |
| | ) | |
| **CITY OF FLORENCE,** | ) | |
| **ALABAMA, LUKE MCINTYRE,** | ) | |
| **and PHILIP MOSS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, John Wesley Burch, who is proceeding *pro se*, filed this case on September 7, 2010.[1]  His amended complaint asserts claims for alleged violations of rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution against the City of Florence, Alabama ("City"), Luke McIntyre, and Charles Philip Moss.[2]  Both individual defendants are police officers for the City, and both are sued in their official and individual capacities.[3]  By previous order, the court has limited plaintiff's claims to events occurring on or after September 6, 2008.[4]  The case currently is before the court on the motion for summary judgment filed by

---

[1] *See* doc. no. 1 (Complaint).

[2] Doc. no. 5 (Amended Complaint).

[3] *Id.* ¶¶ 3-5.

[4] Doc. no. 18 (memorandum opinion and order on motion to dismiss), at 6.

the City,[5] and the motion for summary judgment filed jointly by Luke McIntyre and Philip Moss.[6]   Upon consideration of defendants' motions and evidentiary submissions, the court concludes that both motions should be granted, and all of plaintiff's claims should be dismissed.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is

---

[5] Doc. no. 52.

[6] Doc. no. 54.

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. PROCEDURAL HISTORY

As a result of plaintiff's *pro se* status, this case has a somewhat unusual

procedural history.  A brief recitation of that history will be helpful to a complete

understanding of this case.

Plaintiff did not submit any evidence, or a brief, in opposition to defendants'

motions for summary judgment.  In fact, plaintiff has a history of missing court-

ordered deadlines and disregarding the court's procedures throughout this litigation.

For example, on August 17, 2011, the court granted defendants' motion to compel

discovery and ordered plaintiff to serve defendants with his initial disclosures and responses to all of defendants' written discovery requests.[7]  Plaintiff had failed to comply with the court's order to respond to defendants' motion to compel, and had instead attempted to provide discovery responses to defendants' attorney via electronic mail.  Plaintiff was advised that he would be required to strictly comply with the court's orders in the future, and that communicating with opposing counsel was not sufficient to comply with his duty to respond to a court order.[8]

On December 2, 2011, after approximately six months of unsuccessfully attempting to schedule plaintiff's deposition and otherwise obtain discovery from him, defendants filed a motion to dismiss plaintiff's claims for failure to prosecute.[9] Plaintiff was ordered to show cause why defendants' motion should not be granted;[10] and, while he filed two separate responses to the show cause order, he never explained his failures to meaningfully engage in the discovery process, but instead filed more than sixty pages of argument on the merits of his claims.[11]  Affording plaintiff leeway because of his *pro se* status, this court denied defendants' motion to dismiss on January 6, 2012, and advised plaintiff that it would expect his future

---

[7] Doc. no. 29.

[8] *See id.* at 1-2.

[9] Doc. no. 35.

[10] Doc. no. 36.

[11] *See* doc. nos. 37, 40.

compliance with court orders and the requirements of the Federal Rules of Civil Procedure, despite his *pro se* status. The court extended the discovery deadlines in order to provide plaintiff yet another opportunity to comply with his discovery obligations, and cautioned plaintiff that if he did not appear for deposition at a time and place of defendants' choosing by February 6, 2012, his case would be dismissed without further notice.[12]

Plaintiff later sought a further extension of the discovery deadlines,[13] which the court granted, but advised plaintiff that it would be his *final* extension.[14] The court also noted that plaintiff had developed an unnecessary habit of requesting the Clerk of Court to make emergency arrangements to accept his filings after hours, and informed plaintiff that all future filings must be received by the Clerk no later than 4:30 o'clock p.m. The court also stated:

> If plaintiff makes any future special requests for late filings, he will be required to submit with the filing a detailed, sworn statement of the nature of his alleged emergency. If the court deems plaintiff's statement to be insufficient, plaintiff may be subject to sanctions, including having his pleading stricken from the record, for abuse of the court's procedures. Forgetting a deadline or other lack of diligence will not be an acceptable excuse. Even though plaintiff is proceeding *pro se*, he still must be expected to comply with basic court rules and procedures.[15]

---

[12] Doc. no. 41, at 1-2.

[13] Doc. no. 46.

[14] Doc. no. 48.

[15] *Id.* at 2-3.

On May 25, 2012, plaintiff filed *304 pages* of briefing and evidence in support of a motion for joinder of this case with another lawsuit he filed in this district.[16]  As plaintiff's motion for joinder essentially was a repetition of his previous motion to consolidate, it was denied.[17]  In the order denying the motion for joinder, the court noted that plaintiff had devoted the overwhelming majority of his voluminous brief to a superfluous discussion of the merits of his claims.[18]  In order to prevent any future waste of the court's (and plaintiff's) time, plaintiff was cautioned that he should not argue the underlying merits of his case in every filing, and that any future briefs filed in support of or in opposition to a motion should address only the limited issues implicated by such motions.  The court also mandated that all future briefs by *either* party should not exceed 40 pages of double-spaced, fourteen-point (or larger) type, unless advance permission had been granted, and advised that any non-compliant briefs would be stricken.[19]

Defendants filed their motions for summary judgment on June 11, 2012.[20]  The court entered two separate orders that same day, requiring plaintiff to respond to both

---

[16] *See* doc. no. 49 (motion for joinder); doc. no. 50 (memorandum and evidence in support of motion for joinder).  The other lawsuit is Civil Action No. CV-11-S-3770-NW, and it is styled *John Wesley Burch v. Jeremy Keith Baker, et al.*

[17] *See* doc. no. 57.

[18] *Id.* at 2.

[19] *Id.*

[20] *See* doc. no. 52; doc. no. 54.

motions by July 3, 2012, and reminding him that his responses must comply with the requirements of the Appendix to the Uniform Initial Order.[21]  Plaintiff did not respond to either motion for summary judgment before July 3.  Instead, the Clerk's Office notes indicate that plaintiff telephoned that office at approximately 4:15 o'clock p.m. on July 2, to inquire who would be serving as the "after hours clerk" that day.  He also advised the Clerk's Office staff that he would be in Huntsville to file a pleading at approximately 5:15 or 5:30 o'clock p.m. that day.[22]  Plaintiff did not arrive in Huntsville by 5:30 on July 2 to file his pleading.  Instead, he placed it in the overnight drop box at the Clerk's Office of the United States District Court for the *Middle District* of Alabama in *Montgomery,* Alabama.  The Middle District subsequently forwarded plaintiff's pleading, which was a motion for extension of time to respond to defendants' motions for summary judgment, and for leave to exceed the page limitation, to this court for filing, and it was accepted and placed on the docket of this case on July 5, 2012.[23]  This court leniently granted plaintiff an extension until July 24 to respond to defendants' motions for summary judgment.[24]  The court also allowed plaintiff thirty pages to respond to the motion filed by the City, and fifty

---

[21] *See* text orders entered on June 11, 2012.

[22] *See* Clerk's notes of July 5, 2012.

[23] *See* doc. no. 59.

[24] Doc. no. 60.

pages to respond to the motion filed by McIntyre and Moss.[25]  The court advised plaintiff that his briefs otherwise must strictly comply with the requirements of the Appendix to the Uniform Initial Order, and cautioned him that any non-compliant briefs would be stricken.[26]  The court also ordered that all future filings by either party were required to be made by 4:30 o'clock p.m. on the day they were due, with no exceptions, and no provisions to be made for late or non-compliant filings.[27]

Despite the court's clear directives, plaintiff did not file a response to either motion for summary judgment before July 24.  Indeed, the court heard nothing further from plaintiff until August 17, 2012, when he filed a "motion requesting leave to file out of time motion to strike with incorporated memorandum in excess of page limitation."[28]  The essence of plaintiff's motion was a request for this court to strike any affidavits from witnesses that had not previously been disclosed, and to strike any testimony about subject matters that had not previously been discussed.  Plaintiff's motion for leave was thirteen pages long, and the proposed motion to strike appended to the motion for leave was *ninety-two pages* in length, and was accompanied by an additional thirty-nine pages of exhibits.  As plaintiff's motion failed to comply with

---

[25] *Id.* at 1-2.

[26] *Id.* at 2.

[27] *Id.* at 3.

[28] Doc. no. 63.

the court's previous directives, it was summarily denied on August 30, 2012.[29]  On September 21, 2012, plaintiff filed a "motion requesting leave to file out of time motion to strike with incorporated memorandum of law in excess of page limitation."[30]  The motion to strike that plaintiff sought to file covered eighty-seven pages and asked the court to strike defendants' "dashcam evidence," *i.e.,* the patrol car video recording of one of the primary incidents forming the basis of plaintiff's claims.  The court summarily denied plaintiff's motion on September 26, 2012 — again, because it did not comply with the court's prior, repeated directives.[31]

Plaintiff never filed, or attempted to file, any response to defendants' summary judgment motion that would have come even close to complying with the requirements of the Appendix to the Uniform Initial Order.  With regard to the manner of stating facts in a summary judgment brief, the Appendix provides:

### D.    Manner of Stating Facts

All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs.*  Counsel must state facts in clear, unambiguous, simple, declarative sentences.  All statements of fact must be supported by specific reference to evidentiary submissions.

---

[29] Doc. no. 64.

[30] Doc. no. 65.

[31] Doc. no. 66.

### 1.     Moving Party's Initial Statement of Facts

The moving party shall list in *separately numbered paragraphs* each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment. Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims supports it.

### 2.     Opposing Party's Statement of Facts

Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

#### a.     Response to Movant's Statement

The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

#### b.     Additional Undisputed Facts

The second section may contain additional, allegedly undisputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The second section of the opposing party's statement of facts, if any, shall be clearly designated as such. The opposing party should include only facts which the opposing party contends are true and not in genuine dispute.

### c.      Additional Disputed Facts

The third section may contain additional, allegedly disputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The third section of the opposing party's statement of facts, if any, shall be clearly designated as such. Each statement of allegedly disputed facts must be followed by specific reference to those portions of the evidentiary record which both support and contradict the alleged fact.[32]

The Uniform Initial Order also clearly states that any briefs that do not strictly comply with the summary judgment requirements may be stricken.[33]

Plaintiff did not state any proposed facts in separately numbered paragraphs, and he did not respond, paragraph-by-paragraph, to any of defendant's proposed facts. Thus, as stated in the Uniform Initial Order, plaintiff is deemed to have admitted defendants' factual assertions. Moreover, plaintiff did not submit any evidence to counter defendants' assertions, so there may not be many (if any) factual discrepancies to construe in plaintiff's favor. Even so, because plaintiff is not represented by counsel, the court will take special care to ensure that all of the factual assertions in defendants' briefs are supported by the record, and to determine whether

---

[32] Doc. no. 9 (Uniform Initial Order), at 14-16 (all emphasis in original) (footnotes omitted).

[33] *See id.* at 12 ("This exhibit contains specific, mandatory instructions regarding the preparation and submission of briefs and evidentiary materials in support of and in opposition to potentially dispositive motions. **These instructions *must* be followed explicitly. Except for good cause shown, briefs and evidentiary materials that do not conform to the following requirements may be stricken.**"), 16 ("**The court reserves the right *sua sponte* to STRIKE any statements of fact or responsive statements that fail to comply with these requirements.**") (all emphasis in original).

there are any other relevant facts in the record that were not highlighted by defendants' briefs.

## III. SUMMARY OF FACTS

### A.    Background and Plaintiff's History with the City of Florence Police Department

Plaintiff, John Wesley Burch, is a resident of Florence, Alabama.  He does not have a permanent address, but he receives mail at his parents' home in Florence, and he divides his time between staying in the homes of Florence friends and sleeping in his automobile.[34]  He graduated from a high school in Florence, then received a bachelor's degree in biology and chemistry from Vanderbilt University in Nashville, Tennessee.[35]  He attended medical school at the University of South Alabama for a time, but he failed to complete the requirements for his medical degree because of a substance abuse problem.[36]

Burch has performed a variety of odd jobs, including sometimes working since 2004 as a freelance private investigator, or as an assistant to a private investigator.[37] Even when he is not "on duty" as an investigator, he sometimes takes photographs of

---

[34] Defendants' evidentiary submission, Exhibit 1 (Deposition of John Wesley Burch), at 12-13.

[35] *Id.* at 16.

[36] *Id.* at 16-17.

[37] *Id.* at 21-25.

people and vehicles around him, including police officers and their vehicles.  He explained during his deposition that he takes such photographs because he enjoys documenting what is happening around him.  He also likes to take snapshots of police officers near him because those officers may later write him a ticket.[38]   Plaintiff has attempted to ascertain the home addresses of several Florence police officers, and he has driven by the homes of some of those officers.[39]  In fact, on an unspecified date in 2009, plaintiff was convicted on a misdemeanor charge of attempted criminal surveillance for taking photographs outside the home of Officer Robbie Howard. Plaintiff testified that he wanted to document the automobiles that Officer Howard owned, in order to determine whether they were the same cars that were near him when he received tickets.[40]  He acknowledged, however, that he has never been retained in his official capacity as a private investigator to investigate any police officer, including Officer Howard.[41]

The Florence Police have received several complaints from private citizens about plaintiff's photographic and other unusual activities.  On February 12, 2004, for example, the police received a report that plaintiff had been parked in the parking

---

[38] *Id.* at 152, 213-15, 223.

[39] *Id.* at 206-09, 212-13, 300.

[40] Burch Deposition, at 18, 213, 266.

[41] *Id.* at 23.

lot of Weeden Middle School for a few days with a camera in his hands.  When police

approached plaintiff, he stated that he was assisting in a private investigation.[42]  As

a result of this incident, plaintiff was permanently banned from the Weeden Middle

School premises.[43]

On February 15, 2008, an individual named Tom McClusky reported that he

and his wife had noticed plaintiff taking photographs of the license plates of various

vehicles, including McClusky's own vehicle, and writing down information on a note

pad.[44]  Plaintiff acknowledged during his deposition that it was possible that he was

taking photographs of McClusky on that date, but he could not remember for sure.[45]

On February 20, 2008, an individual named Brod Sheppard filed a complaint

stating that plaintiff began taking photographs of him as he left home for work, and

then followed Sheppard in his vehicle while continuing to take photographs of him.[46]

Plaintiff denied those allegations.[47]

On March 3, 2008, an individual named Homer Cheek reported that plaintiff

---

[42] Defendant's evidentiary submission, Exhibit 3 (Affidavit of Luke McIntyre), at Exhibit B (February 12, 2004 Alabama Uniform Incident/Offense Report).

[43] McIntyre Affidavit, at Exhibit A (Record ID Number 5623, describing plaintiff's trespass from Weeden Middle School).

[44] Burch Deposition, at Exhibit D (February 15, 2008 Alabama Uniform Incident/Offense Report).

[45] Burch Deposition, at 191-200.

[46] Burch Deposition, at Exhibit E (February 20, 2008 Alabama Uniform Incident/Offense Report).

[47] Burch Deposition, at 201-05.

took photographs of his twelve-year-old daughter and niece in a McDonald's restaurant with a cellular telephone camera.  Employees at the McDonald's restaurant informed the officer investigating the report that other patrons had complained about plaintiff taking pictures of them in the past.[48]  Plaintiff denies these allegations.[49]

On July 9, 2008, a bank security officer reported that plaintiff had been photographing the bank while parked in a parking lot across the street.[50]  Plaintiff acknowledged that he may have been taking pictures from the parking lot on July 9, but he did not know if the pictures were of the bank.[51]

On September 6, 2008, an individual named Adam Hudson reported that plaintiff took photographs of him and some friends outside the Rivertown Coffee Shop, and that plaintiff earlier had been following them around the town.[52]  Plaintiff denies that the allegations in the September 6 report are true.[53]

On November 17, 2008, an individual named Jason Robnett reported that plaintiff took a photograph of him inside the Rivertown Coffee Shop, and that

---

[48] Burch Deposition, at Exhibit F (March 3, 2008 Alabama Uniform Incident/Offense Report).

[49] Burch Deposition, at 225-26.

[50] Burch Deposition, at Exhibit G (July 9, 2008 Alabama Uniform Incident/Offense Report).

[51] Burch Deposition, at 227-28.

[52] Burch Deposition, at Exhibit C (September 6, 2008 Alabama Uniform Incident/Offense Report).

[53] Burch Deposition, at 187-89.

plaintiff also followed Robnett outside the coffee shop and took a picture of Robnett's car and tag.[54]  Plaintiff acknowledged that he left the coffee shop the same time as Robnett on November 17 in order to use his cell telephone, but he denied taking any photographs of Robnett or his vehicle.[55]

On December 5, 2008, an individual named Stanley Goldstein reported that plaintiff had been taking photographs of his house, and also took pictures of him at Rivertown Coffee Shop.  A witness also reported that plaintiff had been taking pictures of young ladies at the coffee shop.  As a result, the owner of the coffee shop permanently banned plaintiff from the premises.[56]  Plaintiff denied taking photographs of any girls at the coffee shop, but he acknowledged it was "possible" that he had taken pictures of Goldstein's house.[57]

On May 22, 2009, an individual named Cynthia Berryhill reported that plaintiff snapped photographs of her, her daughter, and their vehicle.[58]  Plaintiff denied those allegations.[59]

---

[54] Burch Deposition, at Exhibit H (November 17, 2008 Alabama Uniform Incident/Offense Report).

[55] Burch Deposition, at 231-33.

[56] Burch Deposition, at Exhibit I (December 5, 2008 Alabama Uniform Incident/Offense Report).

[57] Burch Deposition, at 235-40.

[58] Burch Deposition, at Exhibit J (May 22, 2009 Alabama Uniform Incident/Offense Report).

[59] Burch Deposition, at 241-44.

On October 29, 2009, plaintiff was permanently barred from the Florence Nursing and Rehab Center premises due to "suspicious behavior."[60] Plaintiff testified during his deposition that he experienced an asthma attack while walking by the Nursing and Rehab Center and went inside to call for a ride.  He acknowledged that his behavior might have been perceived as suspicious because he was sweaty and out of breath.[61]

With the exception of the February 2004 incident at Weeden Middle School, plaintiff acknowledged that he was not performing an official private investigatory assignment during any of the incidents recounted above.[62]

Defendant Luke McIntyre, an officer of the Florence Police Department, testified that plaintiff was generally known to him and other officers because of the numerous complaints that had been lodged against him.  McIntyre and other officers were directed to either make contact with plaintiff, or to keep a close watch on him while patrolling.  On some occasions, the Florence Police Department issued an official BOLO ("Be On The Lookout") notice for plaintiff or an individual of his description taking photographs while either parked in or driving an automobile with the same description as plaintiff's vehicle.  On other occasions, McIntyre heard of

---

[60] Burch Deposition, at Exhibit K (October 29, 2009 Alabama Uniform Incident/Offense Report).

[61] Burch Deposition, at 244-48.

[62] *Id.* at 239.

plaintiff's alleged photographic and other suspicious activities through informal conversation with other officers.[63]

On July 18, 2008, plaintiff was at the Rivertown Coffee Shop for a poetry reading. He was sitting quietly, working on his computer, when Ira Davis, a plain clothes Florence Police Officer, sat in a char across from plaintiff and began asking questions about plaintiff's use of his camera. Davis eventually identified himself as a police officer, but he refused to provide an explanation of why he was questioning plaintiff.[64] Davis began talking very loudly and "caused quite a scene," so plaintiff asked Davis if he wanted to talk outside. Davis refused, but told plaintiff they could continue the conversation at the police station.[65] After some time had passed, plaintiff announced to the other patrons of the coffee shop that Davis was an undercover police officer. He later explained that his purpose in making that announcement was to make Davis "feel some restraints."[66] Defendant Luke McIntyre was not present when plaintiff made this announcement, and there is no evidence that Davis shared any information about the incident with McIntyre.[67] In fact, McIntyre

---

[63] McIntyre Affidavit ¶ 5.

[64] Burch Deposition, at 63-65.

[65] *Id.* at 68.

[66] *Id.* at 69-70.

[67] *Id.* at 72-74. Plaintiff testified that he had "extremely strong circumstantial evidence" that Davis discussed the incident with McIntyre, because the two men are neighbors and undercover officers, because both men were interested in his camera, and because he had never seen either of the men before July 18, 2008. *Id.* at 73-74. He acknowledged, however, that his "evidence" actually

offered evidence to the contrary.  He attested that he was not working on July 18, 2008, and he "had no idea until this lawsuit that Mr. Burch had allegedly announced that Officer Davis was an undercover officer at the Coffeehouse that day."[68] Moreover, McIntyre attested that he did not consider any statements made by plaintiff in the coffee shop on July 18 when he later detained plaintiff on September 8, removed him from his vehicle, and searched his camera.[69]

On July 21, 2008, plaintiff was again at the Rivertown Coffee Shop when he saw defendant Luke McIntyre park his patrol car in front of the shop in an abnormal manner that indicated he might be responding to an emergency.  On that occasion, however, McIntyre did not speak to plaintiff or touch any of his possessions.[70]

On August 13, 2008, at 4:30 a.m., plaintiff was driving on Court Street in Florence when McIntyre pulled him over, and asked to see his license and proof of insurance coverage.  McIntyre did not tell plaintiff why he had made the traffic stop, but he did issue plaintiff a citation for failure to carry proof of insurance.[71]  McIntyre did not ask plaintiff about either the coffee shop or Officer Davis.[72]

---

was mere speculation.  *Id.* at 74.

[68] McIntyre Affidavit ¶ 15.

[69] *Id.*

[70] Burch Deposition, at 55-56, 76-79.

[71] *Id.* at 79-83.  Plaintiff later provided proof of insurance, and his ticket was *nolle prossed*. *Id.* at 83.

[72] *Id.* at 84.

During the few weeks leading up to September 6, 2008, McIntyre learned that an inmate at the City jail might have made threats against his life based on his involvement in a prior investigation.  McIntyre had been advised by a supervisory officer that he should maintain a heightened sense of awareness and exercise extra caution while moving about in the community.  McIntyre also was moved from the night shift to the day shift as an additional safety measure.  McIntyre did not know who might be a threat to him, or what kinds of threatening actions might be taken against him, but he did believe it was important to prevent others from becoming aware of his home address.[73]

## B.    The September 6, 2008 Incident

Most of plaintiff's allegations in this lawsuit arise out of an incident that occurred on September 6, 2008.  Plaintiff was driving along a Florence street named "Dr. Hicks Boulevard" when he noticed a sport utility vehicle ("SUV") driving close behind him.  So, he moved into a turn lane to make a left turn onto Wood Avenue. The SUV moved into the turn lane behind plaintiff.[74]  Plaintiff could not see who was driving the SUV, or what the person was wearing, but he possessed a general suspicion that the driver might be defendant Luke McIntyre.[75]  When the SUV turned

---

[73] McIntyre Affidavit ¶ 9.

[74] Burch Deposition, at 85-88.

[75] *Id.* at 89-90.

onto Wood Avenue behind plaintiff, plaintiff decided to turn right into an empty credit union parking lot so that the SUV could pass him.[76] Plaintiff positioned his car so that he could see the SUV pass by, and when it did, plaintiff lifted his camera to take a photograph of the vehicle. He testified that his purpose in taking the picture was to document who had been driving so closely behind him.[77]

The SUV following plaintiff was, in fact, McIntyre's personal vehicle. McIntyre had just completed a shift working for the Florence Police Department, and he was accompanied by Eddie Grissom, a passenger for whom he was providing a ride home. McIntyre was still wearing his police uniform. McIntyre testified that he was turning onto Wood Avenue from Dr. Hicks Boulevard because that was the proper route to Grissom's home. While waiting at the traffic light for the turn onto Wood Avenue, McIntyre noticed that the car in front of him was being driven by an individual he believed to be plaintiff. McIntyre thought he noticed plaintiff making eye contact with him in his rear-view mirror. McIntyre observed plaintiff make the left turn onto Wood Avenue and the right turn into the credit union parking lot. McIntyre testified that plaintiff failed to use his turn signal when turning into the credit union parking lot,[78] and plaintiff could not later recall whether he had used the

---

[76] *Id.* at 90-93.

[77] *Id.* at 93-94, 96, 100-01.

[78] McIntyre Affidavit ¶ 10.

signal.[79]   McIntyre also observed plaintiff raising his camera in a manner that indicated he was taking a photograph of McIntyre's vehicle.  McIntyre decided to approach plaintiff, because he "had performed an illegal turn by failing to signal as required by Alabama law, and because he was further engaging in conduct which was suspicious and merited further investigation."[80]   Consequently, McIntyre drove his vehicle into the credit union parking lot and stopped to the right of plaintiff's driver's side door.[81]

Plaintiff testified that the SUV pulled into the credit union parking lot very quickly and headed in the direction of his car.  He was afraid, because the SUV cut him off and would have collided with his car if it had not stopped.[82]   McIntyre exited his vehicle still wearing his police uniform and requested that plaintiff also exit his vehicle.   Plaintiff immediately recognized McIntyre.[83]   Plaintiff testified that, as McIntyre approached the closed driver's side window of plaintiff's automobile, McIntyre was screaming, heaving, and moving his shoulders up and down, and that McIntyre appeared so "furious" that plaintiff thought he might break through his car

---

[79] Burch Deposition, at 131-32.

[80] Burch Affidavit ¶ 11.

[81] *Id.*

[82] Burch Deposition, at 110-12.

[83] McIntyre Affidavit ¶ 11; Burch Deposition, at 112-15.

window.[84]   Plaintiff attempted to conceal his camera by throwing a shirt over it, because he was afraid that McIntyre would confiscate the camera if it were left out in the open.[85]   McIntyre continued to yell for plaintiff to exit the vehicle.   Plaintiff asked McIntyre what he had done wrong, but McIntyre did not respond.   Plaintiff nonetheless unlocked his car door because he was afraid that McIntyre would break in.[86]   McIntyre opened the door and "manhandled" plaintiff, by violently yanking him out of the automoile, and throwing him to the ground.[87]   McIntyre secured plaintiff's hands in handcuffs behind his back and "felt around for a second," presumably in search of weapons.[88]

McIntyre had contacted police dispatch at some unspecified point to report his location and situation, and other officers arrived on the scene sometime after

---

[84] Burch Deposition, at 115.

[85] *Id.* at 122-25.

[86] *Id.* at 117-19.

[87] *Id.* at 120, 133, 136. McIntyre disputes that he yanked plaintiff from the vehicle and threw him onto the ground.  Instead, McIntyre states that, once plaintiff exited the vehicle on his own, he escorted plaintiff to the back of his automobile and asked him to place his hands on the trunk and spread his legs so he could conduct a routine, non-invasive, protective pat-down. McIntyre Affidavit ¶ 12.  The video recording of the incident does not begin until after plaintiff already had exited his car, so there is no irrefutable evidence contradicting plaintiff's testimony, and it must be taken as true.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[88] Burch Deposition, at 138-39.

McIntyre removed plaintiff from his car.[89]  At some point, plaintiff was allowed to stand, and Officers Tim Tankersley and Matt Minor escorted him to the curb near the entrance of the credit union and forced him to sit.[90]  Plaintiff testified that he remained in handcuffs throughout the entire incident,[91] but the video recording from the dashboard camera in the patrol car driven to the scene by the other individual defendant, Officer Philip Moss, does not show plaintiff in handcuffs.[92]  While he was sitting on the curb, plaintiff repeatedly yelled that he did not consent to his car being searched unless the officers obtained a warrant.[93]  Plaintiff observed defendants McIntyre and Moss engage in an extended discussion, but he could not hear what they were saying.[94]  McIntyre testified that he and Moss discussed how to handle the situation.  McIntyre informed Moss of the history of complaints that had been lodged against plaintiff and relayed all of the previous events of that day, including plaintiff's photographs of McIntyre, plaintiff's attempts to conceal his camera, and plaintiff's failure to use his turn signal when turning into the credit union parking

---

[89] *Id.* at 142.

[90] *Id.* at 142-43.

[91] *Id.* at 143-44.

[92] *See* defendant's evidentiary submission, Exhibit 4 (Affidavit of Phil Moss), at Exhibit A (Video and Audio Recording).  *See also* Moss Affidavit ¶¶ 3-4 (describing the process of recording and retaining video with the dashboard camera, and attesting that the video exhibit filed with the court represents a fair and accurate portrayal of the events it purports to record); *Scott, supra* note 85.

[93] Burch Deposition, at 148-49.

[94] *Id.* at 150.

lot.[95]

Eventually, McIntyre reached into plaintiff's car and grabbed plaintiff's camera.[96]  He explained his decision to do so as follows:

> It was significant to me that Mr. Burch had previously been reported photographing cheerleaders on school property at a time when he may well have been trespassing.  The other incidents of which I was aware and in which Mr. Burch was allegedly involved in suspicious and unexplained photographing activity likewise were significant to me in forming the belief that Mr. Burch's activities justified further investigation.  I strongly suspected and anticipated, based upon previous reports, that Mr. Burch's digital camera would contain photographs indicating that he had followed one or more persons and taken pictures while trespassing on private property, which would constitute the crime of criminal surveillance.  Additionally, I was concerned for my own safety given the threats that existed against me, and given the unexplained and odd nature of Mr. Burch's conduct in photographing my vehicle.  Given all of the foregoing, I made a determination that I had probable cause to enter the vehicle in order to examine the contents of the digital camera, which I knew was in the vehicle.[97]

McIntyre spent several minutes looking through the photographs recorded in the software or on the hard drive of plaintiff's digital camera.[98]  He saw "multiple suspicious photographs of vehicle license plates in various locations," but there was no evidence of plaintiff taking pictures while trespassing in a private place, as

---

[95] McIntyre Affidavit ¶ 15.

[96] Burch Deposition, at 151.

[97] McIntyre Affidavit ¶ 14.

[98] Burch Deposition, at 151.

prohibited by Alabama's criminal surveillance statute. *See* Ala. Code § 13A-11-32.[99]

McIntyre eventually located the photograph that plaintiff had taken of the license plate on McIntyre's car and deleted the picture.[100]  He testified that he did so for his own safety and the safety of his family, because he knew that plaintiff could use the license plate number to locate McIntyre's home address.[101]  McIntyre did not delete any other photographs or harm plaintiff's camera in any way.[102]  Plaintiff acknowledged that the photograph did not have any monetary value, and that his only purpose in taking it was to document that McIntyre was driving the SUV that had been behind him at the traffic light that day.[103]

Defendant Philip Moss witnessed McIntyre deleting the photograph from plaintiff's camera.  In fact, he and McIntyre discussed the situation beforehand, and McIntyre informed Moss that he intended to enter plaintiff's vehicle, look at any photographs on plaintiff's camera, and delete any photograph he might have taken of McIntyre's license plate.  Moss attested that he believed McIntyre had probable cause to enter plaintiff's vehicle and search the camera for evidence of criminal activity, but

---

[99] McIntyre Affidavit ¶ 16.  That statute provides that "[a] person commits the crime of criminal surveillance if he intentionally engages in surveillance while trespassing in a private place." Ala. Code § 13A-11-32(a) (alteration supplied).

[100] Burch Deposition, at 152; McIntyre Affidavit ¶ 16.

[101] McIntyre Affidavit ¶ 16.

[102] McIntyre Affidavit ¶ 16; Burch Deposition, at 153.

[103] Burch Deposition, at 153-54.

he never stated that he believed McIntyre was justified in deleting the photograph. Neither McIntyre nor Moss testified that Moss advised McIntyre whether he should delete the photograph.[104]

After McIntyre deleted the picture, he allowed plaintiff to leave the scene without being arrested.[105]  McIntyre did not "hurt" plaintiff, in the sense of kicking or punching him.[106]  Plaintiff also did not experience any pain because of his handcuffs, and he suffered no cuts or bruises.[107]  Defendant Moss attested that the entire encounter lasted approximately ten minutes.[108]

## C.  The October 28, 2009 Search Warrant Affidavit

On October 28, 2009, plaintiff was pulled over in a traffic stop by Alabama State Trooper Jeremy Baker, who is the brother-in-law of defendant Luke McIntyre.[109] As a result of that traffic stop, plaintiff was arrested and his car was impounded.[110] After an initial inventory search of plaintiff's car had been performed, Trooper Baker

---

[104] Moss Affidavit ¶ 9.

[105] Burch Deposition at 155-56; McIntyre Affidavit ¶ 17.

[106] Burch Deposition, at 139, 142.

[107] *Id.* at 144.

[108] Moss Affidavit ¶ 10.

[109] Burch Deposition, at 252; McIntyre Affidavit ¶ 19.  Plaintiff believes that the traffic stop was part of a conspiracy in which McIntyre was involved, but he is not asserting a claim in this case based upon that alleged conspiracy.  Burch Deposition, at 253-54.

[110] *Id.* at 255.

sought a warrant in order to conduct a more thorough search.[111]   The two-page affidavit executed by Baker to obtain that warrant detailed many of the past incidents involving plaintiff, including some that also involved Trooper Baker.[112]   The affidavit contained one sentence that is important to this litigation: *i.e.,* "Burch has also taken pictures of Florence Police Officer Luke McIntyre and his daughter."[113]   The affidavit was signed by Trooper Baker and by Lauderdale County District Judge Carole Medley.[114]

There is no deposition or affidavit testimony from Trooper Jeremy Baker in the record, but McIntyre testified that he had talked about plaintiff with his brother-in-law in a casual manner during family dinners.  Specifically, McIntyre informed Baker that, sometime after the September 6, 2008 incident, he thought he observed plaintiff photographing him and his young daughter while he was pumping gas at a Florence gasoline station.[115]   McIntyre attested that he never asked Baker to take any criminal or investigatory action against plaintiff, and that he did not know that Baker had included any information about him in the search warrant affidavit.  McIntyre also did

---

[111] *Id.* at 255-57.

[112] *See* Burch Deposition, at Exhibit L (Affidavit for Search Warrant).

[113] *Id.* at 2; Burch Deposition, at 259.

[114] Burch Deposition, Exhibit L, at 2.

[115] McIntyre Affidavit ¶¶ 18-19.

not personally initiate any investigative action against plaintiff.[116]

## D.    Facts Related to the City's Liability

Plaintiff testified that he never filed a report about the September 6, 2008 incident with the Internal Affairs Division of the Florence Police Department or any other City agency.[117]   He believes that the Internal Affairs Division has a policy of destroying all citizen complaints after a certain period of time has passed, but he has no evidence, other than hearsay, to support that belief, and he could not identify any individual employed by the City of Florence who might be responsible for adopting that policy.[118]   He also alleged that no Florence Police Officer has ever been disciplined as a result of an Internal Affairs Complaint, but he acknowledged during his deposition that he has no evidence to support that allegation.[119]

Defendants, on the other hand, produced evidence to counter plaintiff's allegations.  Melissa Beasley, the Commander of the Florence Police Department's Criminal Investigations Division and the Office of Integrity and Compliance (which formerly was known as the Internal Affairs Division), attested that the Department

---

[116] *Id.* ¶¶ 19-20.

[117] Burch Deposition, at 309, 321.

[118] *Id.* at 308-317.

[119] *Id.* at 319-20.  Plaintiff testified during his deposition that he had documentation of the fact that no officer had ever been disciplined as the result of an Internal Affairs complaint, and he promised to produce it to opposing counsel.  *Id.*  There is no indication, however, that plaintiff ever did so, and there is no such evidence in the record before this court.

requires all officers to attend training on the Alabama State Standards for Law Enforcement, which includes instruction on Alabama laws and pertinent federal constitutional rights.[120]   The Department also has a policy of investigating all complaints or allegations of misconduct by its officers, and of administering appropriate discipline, including oral and written reprimands, suspension, transfer, counseling, and/or termination, in the event any complaint or allegation is found to be meritorious.[121]

Officer Beasley also attested that the Department's Office of Integrity and Compliance ("the Office") is responsible for processing and investigating both internal and external complaints of officer misconduct, including allegations of constitutional violations.   The Office  has plenary authority to conduct its investigations, and all officers are required to fully comply.[122]  The Office reports its investigatory findings to the Chief of Police for a decision about what disciplinary action might be merited.  According to Beasley, since 2004, several officers have been disciplined as a result of complaints made to the Office.[123]

Beasley also attested that it "is and has long been the policy and practice of the

---

[120] Defendants' evidentiary submission, Exhibit 5 (Affidavit of Melissa Beasley) ¶¶ 1, 4.

[121] *Id.* ¶ 5.

[122] *Id.* ¶ 6.

[123] *Id.* ¶ 7.  *See also id.* ¶ 8 for specific examples of investigations conducted and disciplinary actions taken.

Office to *maintain* all files of officer complaints, and *not* to destroy those files."[124]

Complaint files are stored at the Police Station as long as there is space, and then they

are transferred to an off-site storage facility.   Beasley personally confirmed through

a document review that the City maintains Internal Affairs complaint files dating back

to at least January 1, 1985 at an off-site storage location.[125]

## IV. DISCUSSION

**A.      Claims Against Individual Defendants McIntyre and Moss**

Plaintiff sued Luke McIntyre and Philip Moss in their official and individual

capacities.

### 1.       Official capacity claims

Defendants assert that plaintiff's claims against them in their *official* capacities

as police officers for the City of Florence should be dismissed because they are

redundant of plaintiff's claims against the City itself.   Defendants are correct that

official-capacity suits

> "generally represent only another way of pleading an action against an
> entity of which an officer is an agent."   *Monell v. New York City Dept.
> of Social Services*, 436 U.S. 658, 690, n. 55, 98 S .Ct. 2018, 2035, n. 55,
> 56 L. Ed. 2d 611 (1978).   As long as the government entity receives
> notice and an opportunity to respond, an official-capacity suit is, in all
> respects other than name, to be treated as a suit against the entity.

---

[124] *Id.* ¶ 9 (emphasis in original).

[125] *Id.*

*Brandon*[ *v. Holt*], 469 U.S. [464], 471-472 [(1985)].

*Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) (alterations supplied). Accordingly, plaintiff's official capacity claims against McIntyre and Moss will be dismissed with prejudice.

### 2.    Individual capacity claims

McIntyre and Moss assert that they each are entitled to qualified immunity from plaintiff's claims against them in their individual capacities.  The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts generally apply a two-part test for evaluating whether a defendant is entitled to qualified immunity.  The "threshold question" for the district court to ask is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001).[126]  If the threshold question is answered positively,

---

[126] The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it cannot reasonably be disputed that both McIntyre and Moss were acting within the scope of their discretionary authority as police officers when they stopped and questioned plaintiff on September 6, 2008.

the court will proceed to analyze the second aspect of the two-part inquiry: *i.e.,* "whether the right was clearly established."  *Id.*[127]

### a.   Unlawful search and seizure — McIntyre

Plaintiff alleged the following in his amended complaint:

> The Fourth Amendment prohibits police from stopping an automobile and detaining the driver unless they have a reasonable, articulable suspicious [sic] that the driver is violating or is about to violate the law.  By stopping and detaining Mr. Burch for no legal reason and then refusing to tell him why he had been pulled over, or why he was dragged from his car and violently thrown to the ground and handcuffed, or why his car had been searched, or why his camera was examined, or why the photograph of Officer McIntyre's SUV had been deleted, Officer Luke McIntyre deprived Mr. Burch of his right to be secure in his person and to be free from unreasonable searches and seizures as protected by the Fourth and Fourteenth Amendments of the United States Constitution.[128]

He also alleges that McIntyre's actions deprived him of his "right to be free from an unlawful search of Plaintiff's vehicle[ and] the right to be free from the unreasonable seizure, inspection, and deletion of photographs on the Plaintiff's camera by Officer

---

[127] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").  It is now within this court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established." *Id.*  That said, and under the circumstances of the present case, the tested sequence of analysis of *Saucier* will be followed.

[128] Amended Complaint ¶ 76 (alteration supplied).

Luke McIntyre."[129]

Insofar as this claim addresses the initial traffic stop, or the level of force McIntyre used in removing plaintiff from his vehicle, those issues are addressed below, in the sections on unlawful arrest and excessive force.  Insofar as the claim relates to McIntyre's search of plaintiff's car, examination of plaintiff's camera, and deletion of a photograph, it warrants more discussion.

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  This fundamental right is generally preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer upon a showing of probable cause.  *See Maryland v. Dyson*, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014, 144 L. Ed.2d 442 (1999).  There are, of course, exceptions to the general rule that a warrant must be secured before a search is undertaken, one of which is the automobile exception.  Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (*i.e.*, operational); and (2) agents have *probable cause* to believe the vehicle contains contraband or evidence of a crime.  *See Dyson*, 527 U.S. at 466-67, 119 S. Ct. at 2014; *United States v. Watts*, 329 F.3d 1282, 1285 (11th Cir. 2003).
>
> Accordingly, a vehicle search will not violate the Fourth Amendment if it is authorized by the terms of a valid search warrant or, where agents conduct a warrantless search, if the vehicle is operational and "under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found'" in the vehicle. *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)).

---

[129] *Id.* ¶ 79(c).

*United States v. Tamari,* 454 F.3d 1259, 1261-62 (11th Cir. 2006) (emphasis supplied). Moreover, for an officer to be entitled to qualified immunity from a Fourth Amendment claim for unlawful search and seizure of the contents of an automobile, the standard is even lower: the officer need only demonstrate that he had *arguable* probable cause to believe the vehicle contained contraband or evidence of a crime. *See Cottrell v. Caldwell,* 85 F.3d 1480, 1485 n.1 (1996) ("[W]hen the claim is that a search and seizure or arrest violated the Fourth Amendment, qualified immunity depends upon whether arguable probable cause existed."). "*Arguable* probable cause exists if, under all of the facts and circumstances, an officer reasonably could — not necessarily would — have believed that probable cause was present." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir.2004) (emphasis supplied). "When performing our arguable probable cause analysis, we look at the information known to the officer at the time of the [search]." *Bailey v. City of Miami Beach,* 476 F. App'x 193, 197 (11th Cir. 2012) (citing *Jones v. Cannon,* 174 F.3d 1271, 1283 n. 4 (11th Cir. 1999)) (alteration supplied).

If an officer has probable cause (or arguable probable cause) to search a vehicle, then he also is permitted to search containers within the vehicle, even without a warrant. *See California v. Acevedo,* 500 U.S. 565, 580 (1991) ("The police may search an automobile *and the containers within it* where they have probable cause to

believe contraband or evidence is contained.") (emphasis supplied).   Thus, if plaintiff's camera can be considered a "container" for purposes of the automobile exception, McIntyre was permitted to search it as long as he had at least arguable probable cause to search plaintiff's vehicle in the first place.

Although it does not appear that the Eleventh Circuit has directly addressed the issue, other courts have held that electronic devices can be considered "containers" for purposes of the Fourth Amendment search and seizure analysis when they are located within a moving automobile.  *See, e.g., United States v. Runyon,* 275 F.3d 449, 458 (11th Cir. 2001) (assuming, without deciding, that computer disks are "containers").  The most instructive line of cases concerns cellular telephones.  The majority of district courts addressing the issue have held that cell telephones are "containers," and they accordingly are subject to search when removed from an operational automobile, as long as there is probable cause to believe the telephone contained evidence of a crime.  *See United States v. Lujan,* No. 2:11CR11-SA, 2012 WL 2861546, *11 (N.D. Miss. July 11, 2012) ("Although the Fifth Circuit has not extended the automobile exception to cover the warrantless searches of electronic devices, several district courts have allowed such warrantless searches as long as there is probable cause to believe the phone contained evidence of a crime.") (citing *United States v. Garcia–Aleman,* No.1:10-CR-29, 2010 WL 2635071, *12 (E.D. Tex.

June 9, 2010); *United States v. Monson–Perez*, No.4:09CR623-HEA, 2010 WL 889833, *6-8 (E.D. Mo. Mar. 8, 2010); *United States v. James*, No. 1:06CR134-CDP, 2008 WL 1925032, *3–9 (E.D. Mo. Apr. 29, 2008); *United States v. Fierros–Alvarez*, 547 F. Supp. 2d 1206, 1213-14 (D. Kan. 2008)). *See also United States v. Davis,* 787 F. Supp. 2d 1165, 1171 (D. Or. 2011) ("Cell phones may be searched for call records and other data pursuant to the automobile exception to the warrant requirement."); *U.S. v. Stringer,* No. 10-05038-01-CR-SW-GAF, 2011 WL 3847026, *8 (W.D. Mo. July 20, 2011) ("[T]he majority position appears to favor a holding that cell phones and cameras should be viewed as containers for purposes of Fourth Amendment law.").

This court is persuaded by the reasoning of the decisions cited above. Furthermore, it is logical to conclude that, if cellular telephones — most of which not only contain cameras, but also store the user's personal information — are "containers" subject to a warrantless search, then cameras also should be. *See United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) (observing that "cell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers"). For such reasons, this court concludes that plaintiff's camera was a "container" and, therefore, subject to search under the automobile exception, as long as McIntyre had probable cause (or, for the

qualified immunity analysis, *arguable* probable cause) to believe the camera contained evidence of a crime.[130]

McIntyre attested that he was aware of multiple past complaints about plaintiff's photographic activity, including taking photographs of cheerleaders while possibly trespassing on school property, taking pictures of other minor girls at a restaurant, and taking pictures of a school principal at his private residence.  Because of plaintiff's suspicious activities, McIntyre had been instructed by his supervisors to be mindful of plaintiff's activities in the future.  McIntyre also attested that, based on the totality of his knowledge of plaintiff's prior photographing activities, he suspected that plaintiff's camera would contain photographs indicating that he had followed individuals and/or taken photographs while trespassing on private property.  Those activities could constitute evidence of the offense of criminal surveillance, in violation of Alabama Code § 13A-11-32.  Moreover, McIntyre observed plaintiff attempting to conceal his camera inside his car after McIntyre pulled into the credit union parking lot.  The court concludes that, based upon all of the preceding circumstances, McIntyre had at least arguable probable cause to believe plaintiff's camera might contain evidence of criminal activity.  Therefore, McIntyre's seizure

---

[130] The automobile exception only applies to vehicles that are in motion or are at least operational.  It cannot reasonably be disputed that McIntyre observed plaintiff's vehicle in motion immediately prior to the traffic stop in the credit union parking lot, or that the vehicle was operational at the time.

of the camera and examination of its contents did not violate plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.  Even if there was a violation, McIntyre is entitled to qualified immunity from suit for that violation.

The next question is whether McIntyre's deletion of the photograph of his own license plate from the digital storage device of plaintiff's camera constituted an unlawful seizure of plaintiff's property in violation of the Fourth Amendment. McIntyre does not even attempt to argue that his actions did not constitute a seizure under the Fourth Amendment.  Instead, he asserts that, even if there was a violation of plaintiff's Fourth Amendment rights, it is not actionable because it caused only *de minimis* injury.  Indeed, the Supreme Court has acknowledged that there is "a *de minimis* level of imposition with which the Constitution is not concerned." *Ingraham v. Wright,* 430 U.S. 651, 674 (1977).  McIntyre relies upon three Fourth Amendment cases to support his argument that the deletion of plaintiff's photograph was only a *de minimis* violation.

First, in *United States v. Jacobsen,* 466 U.S. 109 (1984), the Supreme Court held that destruction of a small amount of cocaine powder during a field test was only a *de minimis* violation because "only a trace amount of material was involved," the previous possessors of the cocaine did not appear to have noticed its loss, and the cocaine had already been lawfully detained.  *Id.* at 125.  More recently, in *Porter v.*

*Jewell,* 453 F. App'x 934 (11th Cir. 2012), the Eleventh Circuit addressed a Fourth Amendment seizure claim after an officer banged and kicked on the plaintiff's door, cracking the door frame, damaging the deadbolt, and preventing the plaintiff from leaving the apartment for a short period of time. *Id.* at 937. Because the damage "was relatively minor and was able to be repaired within an hour," the Eleventh Circuit found it to be *de minimis* and, therefore, not actionable. *Id.* Finally, in *Williams v. Alford,* 647 F. Supp. 1386 (M.D. Ala. 1986), the district court addressed the plaintiff's claim for an unreasonable search and seizure after officers executing a search warrant for cocaine left his apartment "in disarray," knocking holes in the walls to remove plaster in search of cocaine, breaking a $300 stereo, damaging some of the other items seized, and dumping trash out of the trash can. *Id.* at 1391-92. Other than with regard to the stereo that was broken, the plaintiff did not provide any estimates of the extent (or dollar value) of damage to his personal property. *Id.* at 1392. While the district court did not use the term "*de minimis,*" it did acknowledge that "relatively minor tortious conduct by police officers will not negate the constitutionality of a search." *Id.* (citing *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1509 (11th Cir. 1985) (Tjoflat, J., concurring in part and dissenting in part), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989)). Considering all of the circumstances, particularly the officers' knowledge that

-40-

cocaine often is hidden in unusual places and the fact that the plaintiff was able to clean up the mess "rather easily," the Middle District court concluded that the officers' search was reasonable and, thus, not in violation of the Fourth Amendment. *Williams,* 647 F. Supp. at 1392.

McIntyre asserts that his deletion of plaintiff's photograph was only a *de minimis* violation because there was no monetary value associated with the deleted photograph. He also asserts that the photograph had no *non-monetary* value, because plaintiff's sole purpose in taking it was to document that McIntyre was driving behind him on Dr. Hicks Boulevard, a fact that already has been established in this litigation. Finally, McIntyre relies upon plaintiff's acknowledgment, after being pressed during deposition, that he could recreate what was lost by following McIntyre to his house and taking another photograph of the license plate, but that he did not have any desire to do so.

The court is persuaded by McIntyre's arguments. Deleting the photograph from plaintiff's camera amounted to no more than a *de minimis* violation. The photograph had little to no monetary value, no identifiable non-monetary value, and could easily have been recreated by plaintiff. Thus, McIntyre's deletion of the photograph was akin to the destruction of trace amounts of cocaine described in *Jacobsen,* and significantly less severe than the property damage described in *Porter*

and *Jewell*.  Because McIntyre's deletion of a single photograph from plaintiff's digital camera constituted only a *de minimis* violation of plaintiff's Fourth Amendment rights, McIntyre cannot be held liable under the Fourth Amendment for his actions.

In any event, McIntyre is entitled to qualified immunity on this claim.  To establish entitlement to qualified immunity, McIntyre must show that plaintiff's Fourth Amendment right to be free from the unreasonable seizure of his photograph was clearly established at the time of the alleged violation.  In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'"  *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003) (bracketed alterations in original) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).  The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope*, 536 U.S. at 739.  Instead,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,*

472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope,* 536 U.S. at 741 (bracketed alterations in original).

An officer can receive "fair notice" of his or her unlawful conduct in various ways.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.* This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County, Ala.*]*,* 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide

-43-

principles of law.  And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.*  That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances."  We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.  On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original).

McIntyre asserts that

[t]here was no materially similar, binding decisional authority *clearly establishing* that the deletion of the photographs would violate the Constitution under the unique and compelling circumstances of this case, *i.e.,* when the officer had active death threats against him and when the plaintiff was admittedly acting suspiciously on the day in question in taking pictures of the officer, and had in the past engaged in a course of taking suspicious, and some likely illegal, photographs.[131]

The court agrees that McIntyre did not have "fair warning" that his deletion of

---

[131] Doc. no. 55 (defendants' summary judgment brief), at 41 (emphasis in original, alteration supplied).

a single photograph of his own license plate from plaintiff's digital camera would violate plaintiff's Fourth Amendment rights, especially considering that the deletion constituted only a *de minimis* violation.  Therefore, even if plaintiff did have a viable Fourth Amendment claim against McIntyre for the deletion of the photograph, McIntyre would be entitled to qualified immunity on that claim.

### b.      Excessive force — McIntyre

Plaintiff also alleged in his amended complaint that McIntyre "used excessive and wholly unwarranted force in his apprehending of Burch on the afternoon of August 6, 2008, and inflicted significant pain upon Burch as he slammed him down to the concrete on his stomach and chest."[132]  The court presumes that the reference to *August 6* was a typographical error, as it appears to be undisputed that the incident in question occurred on *September* 6, 2008.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  The reasonableness inquiry is an objective one:  "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

---

[132] Amended Complaint ¶ 77.  *See also id.* ¶ 79(b) (alleging that McIntyre's actions deprived plaintiff of his "right to be free from the use of excessive force").

-45-

underlying intent or motivation." *Graham,* 490 U.S. at 397 (citations omitted). In other words, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* (citations omitted) (alteration supplied).

The court may consider a number of factors when determining whether the force applied was "reasonable" under the circumstances, including: (1) the "severity, or lack of severity, of the alleged crime in issue," *id.* at 396; (2) "whether the person against whom the force was used posed an immediate threat to the safety of the police or others," *id.*; (3) "the need for the application of force," *Jackson v. Sauls*, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000); (4) "the relationship between the need and the amount of force used," *id.*; (5) "the extent of the injury inflicted," *id.*; (6) "whether the force was applied in good faith or maliciously and sadistically," *id.*; (7) "the possibility that the persons subject to the police action are themselves violent or dangerous," *id.*; (8) "the possibility that the suspect may be armed," *id.*; (9) "the number of persons with whom the police officers must contend at one time," *id.*; and (10) "whether the suspect was resisting or fleeing." *Id.*

The reasonableness of the force applied also is measured as of the precise moment it is administered; events that occurred before that moment, though perhaps

giving factual context to the use of force, are not probative of the reasonableness of the decision to use force.  *See Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991). Additionally, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 396) (alteration supplied).   "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.

Here, considering the facts to be as stated by plaintiff in his deposition, McIntyre yanked plaintiff from his car, threw him to the ground, handcuffed him, and patted him down in search of weapons.[133]  Those facts, even if construed in the light most favorable to plaintiff, are insufficient to support a claim for excessive force. While plaintiff was the sole suspect involved in the traffic stop, and his alleged offenses — failure to use a turn signal and suspicious photographic activity — are not extremely severe or immediately dangerous, the other factors weigh in McIntyre's

---

[133] The dashboard camera recording does not show plaintiff in handcuffs, and it does not show McIntyre forcibly removing plaintiff from his car or throwing him to the ground.  The court will, however, give plaintiff the benefit of assuming that these actions may have occurred before Moss arrived on the scene and his patrol car's camera began to record.

favor. *See Durruthy v. Pastor,* 351 F.3d 1080, 1094 (11th Cir. 2003) ("This circuit has made clear that *some* use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense.") (emphasis supplied) (citations omitted). Plaintiff acknowledged that he resisted McIntyre's first few requests to get out of his car, and that he attempted to conceal his camera under a shirt in his car. McIntyre may reasonably have feared that plaintiff also was concealing weapons, thereby necessitating the separation of plaintiff from the vehicle. Most importantly, the level of force McIntyre used was reasonably calculated to effect the legitimate purpose of removing plaintiff from the car and subduing him sufficiently to continue the investigation. As defendants point out, the Eleventh Circuit has approved even greater uses of force under even less threatening circumstances. *See, e.g., Durruthy,* 351 F.3d at 1084, 1094 (forcing an arrestee to the ground, kneeing him in the back, and handcuffing him did not constitute excessive force, even if it may have been "unnecessary" because the arrestee was not resisting); *Nolin v. Isbell,* 207 F.3d 1253, 1253, 1258 (11th Cir. 2000) (finding no excessive force when the officer grabbed the plaintiff, shoved him a few feet against a vehicle, pushed his knee into the plaintiff's back, pushed the plaintiff's head against the van, searched the plaintiff's groin area in an uncomfortable manner, and placed the plaintiff in handcuffs, resulting in minor

-48-

bruising).  Finally, it is important to note that plaintiff did not suffer any cuts, bruises, or other injuries as a result of McIntyre's contact with him, and he did not experience pain from allegedly being handcuffed.

In summary, the level of force employed by McIntyre during his investigatory detention of plaintiff[134] was reasonable under the circumstances.  Accordingly, summary judgment is due to be granted in McIntyre's favor on plaintiff's excessive force claim.[135]

### c.    Unlawful arrest — McIntyre

Plaintiff alleged in his amended complaint that McIntyre's

> excessive force was directed toward securing Officer McIntyre's unlawful arrest of the Plaintiff, an arrest clearly sparked by the Plaintiff's lawful use of his camera, rather than upon a legitimate probable cause basis (arguable or real) to believe that the Plaintiff had just committed or was about to commit a criminal act.[136]

He also alleged that McIntyre's actions deprived him of his "right to be free from false arrest, or a right to be free from an arrest without probable cause."[137]

As an initial matter, there is no evidence that plaintiff actually was placed

---

[134] *See* the discussion in the following subsection, explaining why the traffic stop was an investigatory detention, and not an arrest.

[135] Because it already has been determined that there is no evidence to support plaintiff's excessive force claim, the court need not move on the second step of the qualified immunity analysis, *i.e.,* to evaluate whether the rights violated were clearly established.

[136] Amended Complaint ¶ 78.

[137] *Id.* ¶ 79(a).

under arrest on September 6, 2008.[138]   Instead, the incident was more like an investigatory detention.   That distinction is important because an investigatory detention must only be supported by an officer's reasonable suspicion of criminal activity, while an arrest must be supported by probable cause, a stricter standard.  *See United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir. 1989) ("In order to justify a fourth amendment seizure [with regard to an investigaory detention], the government must show a reasonable and articulable suspicion that the person has committed or is about to commit a crime.").

"In determining 'when' an investigative stop ripens into an arrest, no bright-line rule exists.   Instead, in determining whether an investigative detention is unreasonable, 'common sense and ordinary human experience must govern over rigid criteria.'" *Hastamorir*, 881 F.2d at 1556 (quoting *United States v. Espinosa-Guerra,* 805 F.2d 1502, 1509 (11th Cir. 1996) (in turn quoting *United States v. Sharpe,* 470 U.S. 675, 685 (1985))).   The court must consider the totality of circumstances, including "the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts relied upon by the officers." *United States v. Blackman,* 66 F.3d 1572, 1576 (11th Cir. 1995) (citing *Courson v. McMillian,* 939

---

[138] The record contains evidence that plaintiff has been arrested for other offenses on other dates, but it is clear that his unlawful arrest claim against McIntyre arises out of the September 6, 2008 incident.

F.2d 1479, 1492 (11th Cir. 1992)).

Here, the intrusion on plaintiff's freedom was relatively brief, as the only evidence before the court addressing the length of plaintiff's detention indicates that the entire incident lasted only approximately ten minutes. Moreover, there is no evidence that McIntyre did anything more than temporarily detain plaintiff for the purpose of securing him, and stabilizing the situation, so that he could question plaintiff and determine whether to search his car. *See United States v. Kapperman,* 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("Police may take reasonable action, based upon the circumstances, to protect themselves during [investigative detentions], or to maintain the status quo.") (citations omitted). The evidence addressing the question of whether plaintiff was handcuffed at any point during the incident is disputed, but even if he was handcuffed, that would not necessarily transform the detention into an "arrest" in the constitutional sense of that term. *See Blackman*, 66 F.3d at 1576 ("[T]he fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest.") (alteration supplied) (citing *Kapperman*, 764 F.2d at 790 n.4; *Hastamorir*, 881 F.2d at 1556). Finally, plaintiff was not taken into police custody and transported to the municipal jail, or even issued a written citation.

Because the September 6th incident was only an investigatory detention, as

opposed to an "arrest," it need only be justified by a reasonable suspicion of criminal activity. "Reasonable suspicion requires more than a hunch; it requires that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the person engaged in unlawful conduct." *Blackman,* 66 F.3d at 1576 (citing *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993)). Here, McIntyre personally observed plaintiff turn into the credit union parking lot without using his turn signal. Therefore, McIntyre had, *at least,* a reasonable suspicion that plaintiff had engaged in unlawful conduct, even if such conduct was a minor driving infraction. *See United States v. Spoerke,* 568 F.3d 1236, 1248 (11th Cir. 2009) (holding that an officer had probable cause, a higher standard than reasonable suspicion, to make a traffic stop when he personally observed the driver throw a piece of paper out the window in violation of an anti-littering law). It is irrelevant whether McIntyre may have had other subjective motivations for stopping plaintiff, or whether he suspected plaintiff may have engaged in other criminal activity. *Whren v. United States,* 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

In summary, the September 6, 2008 encounter between plaintiff and McIntyre was an investigative detention that never matured into an actual arrest. Because that detention was supported by McIntyre's reasonable suspicion that plaintiff had

engaged in criminal activity, summary judgment is due to be granted in McIntyre's favor on plaintiff's claim for unlawful arrest.[139]

### d.     Malicious prosecution — McIntyre

Plaintiff alleged in his amended complaint that McIntyre's actions violated his "right to be free from malicious prosecution" under both federal and state law.[140] Plaintiff later clarified during his deposition testimony that his malicious prosecution claims are premised upon the statements McIntyre allegedly made to Alabama State Trooper Baker, which later were referenced in Baker's October 28, 2009 search warrant affidavit.[141]

The Eleventh Circuit recognizes malicious prosecution as "a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." *Wood v. Kesler,* 323 F.3d 872, 881 (11th Cir. 2003) (citations omitted).

> To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable *seizures* in addition to the elements of the common law tort of malicious prosecution. *See Uboh*[ *v. Reno*], 141 F.3d [1000,] 1002-04[ (11th Cir. 1998)]; *Whiting*[ *v. Traylor*], 85 F.3d [581,] 584-86[ (11th Cir. 1996)]; *Kelly*[ *v. Curtis*], 21 F.3d [1544,] 1553-55 [(11th Cir. 1994)].  As to the constituent elements of the common law tort of malicious prosecution, this Court has looked to both

---

[139] Because it already has been determined that there is no evidence to support plaintiff's unlawful arrest claim, the court need not move on the second step of the qualified immunity analysis, *i.e.,* to evaluate whether the rights violated were clearly established.

[140] Amended Complaint ¶ 79(d).

[141] Burch Deposition, at 41-44.

-53-

federal and state law and determined how those elements have historically developed. *Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86.

*Wood,* 323 F.3d at 881 (emphasis in original).  A claim for malicious prosecution requires proof of the following elements under Alabama law:

> (1) that a prior judicial proceeding was instituted by the present defendant, (2) that in the prior proceeding the present defendant acted without probable cause and with malice, (3) that the prior proceeding ended in favor of the present plaintiff, and (4) that the present plaintiff was damaged as a result of the prior proceeding.

*Delchamps, Inc. v. Bryant,* 738 So. 2d 824, 831-32 (Ala. 1999) (citations omitted).

Plaintiff cannot succeed on his malicious prosecution claim under either federal or state law because he cannot establish that McIntyre instituted a prior judicial proceeding against him.  Setting aside the question of whether obtaining a search warrant is the institution of a judicial proceeding under Alabama law, the evidence indicates that Baker, not McIntyre, obtained the search warrant.  The affidavit Baker submitted bore only the signatures of Baker and the issuing judge, not McIntyre's signature.  In fact, there is no evidence that McIntyre had anything whatsoever to do with the warrant.  By his own, uncontradicted testimony, he did not ask Baker to obtain a warrant or take any other action with regard to plaintiff.  He did not even know that Baker had included any information about him in the search warrant affidavit.  The one sentence in the search warrant affidavit that referenced McIntyre

-54-

— *i.e.,* "Burch has also taken pictures of Florence Police Officer Luke McIntyre and his daughter"[142] — was based on casual conversations McIntyre and Baker had shared as brothers-in-law.

"Alabama law permits recovery for malicious prosecution only from those who are directly responsible for that prosecution." *Escoffier v. Anderson*, 557 So.2d 844, 844 (Ala. Civ. App. 1990) (citing *Cutts v. American United Life Insurance Co.*, 505 So.2d 1211 (Ala.1987)). "Furthermore, merely providing, or negligently failing to provide, law enforcement officials with information is not sufficient to make one accountable for any prosecution which may result from such limited action." *Escoffier,* 557 So. 2d at 844 (citing *Cutts,* 505 So. 2d 1211).

Because plaintiff has not presented any evidence that Baker instituted a criminal proceeding against him after obtaining a search warrant from the state court judge, summary judgment is due to be granted in defendant's favor on plaintiff's malicious prosecution claim under both federal and state law.[143]

### e.     First Amendment retaliation — McIntyre

Plaintiff alleged in his amended complaint that McIntyre's actions violated his

---

[142] *See* Burch Deposition, at Exhibit L (Affidavit for Search Warrant); Burch Deposition, at 159.

[143] Because it already has been determined that there is no evidence to support plaintiff's malicious prosecution claim, the court need not move on the second step of the qualified immunity analysis, *i.e.,* to evaluate whether the rights violated were clearly established.

"right to be free from physical retaliation for reasonably exercising his freedom of speech."[144]   The protected speech for which plaintiff alleges he suffered retaliation was "calling attention to the fact that the party responsible for the unwarranted show of disorderly conduct at Rivertown coffee on July 18, 2008, was Florence Police Officer Ira Davis."[145]

To succeed on his claim for retaliation in violation of the First Amendment, plaintiff must demonstrate that:  (1) his speech was constitutionally protected; (2) defendants' conduct adversely affected the protected speech; and (3) there is a causal connection between defendants' actions and the adverse effect on plaintiff's speech. *Bennett v. Hendrix,* 423 F.3d 1247, 1250 (11th Cir. 2005) (citations omitted).  Even assuming that plaintiff's announcement of Officer Davis's status as an undercover officer constituted speech protected by the First Amendment,[146] and that the September 6, 2008 traffic stop constituted an actionable "adverse action," there is no evidence of a causal connection between McIntyre's alleged retaliatory conduct and plaintiff's allegedly protected speech.  It is undisputed that McIntyre was not present

---

[144] Amended Complaint ¶ 79(e).

[145] *Id.*

[146] This assumption is a tenuous one.  The First Amendment does not protect speech that obstructs government operations.  *Haig v. Agee,* 453 U.S. 280, 308-09 (1981).  Other district courts have applied this general principle to exclude from the First Amendment's protection statements disclosing the identity of undercover police officers.  *See United States v. Twinn,* 369 F. Supp. 2d 721, 724-25 (E.D. Va. 2005).

at the Rivertown Coffee Shop on July 18, 2008, and plaintiff has offered no evidence to refute McIntyre's testimony that he was unaware of the statements that plaintiff had made at the coffee shop on July 18 when he stopped plaintiff and searched his car on September 6.  If McIntyre was unaware of plaintiff's allegedly protected speech when he took the allegedly retaliatory actions, there can be no causal connection between plaintiff's speech and McIntyre's actions.  *See, e.g., Farrow v. West,* 320 F.3d 1235, 1249 (11th Cir. 2003) (holding that summary judgment was proper on a First Amendment retaliation claim when the defendant had no knowledge of the plaintiff's protected activity before taking the allegedly retaliatory actions). Therefore, summary judgment is due to be granted in McIntyre's favor on plaintiff's claim for retaliation under the First Amendment.

### f.    Unlawful search and seizure — Officer Philip Moss

Plaintiff alleged in his amended complaint that, "[b]y personally giving Officer McIntyre permission (on September 6, 2008) to search the Defendant's [sic] vehicle, seize his camera, and delete photographs, Florence Police Department officer Phil Moss participated in the constitutional deprivation of Burch's right to be free from unreasonable search and seizure."[147]  Because that claim is based upon Moss's alleged acquiescence to McIntyre's search of plaintiff's vehicle and camera, and to

---

[147] Amended Complaint ¶ 80.  Plaintiff clarified during his deposition that this is the only claim he is asserting against Moss.  Burch Deposition, at 28-33.

McIntyre's deletion of plaintiff's photograph, it cannot succeed.  The court already

has ruled that McIntyre's actions did not violate plaintiff's Fourth Amendment rights.

**B.**    **Claims Against the City of Florence**

Plaintiff asserted the following against the City in his Amended Complaint:

81.    The City of Florence is directly responsible for such behavior [of Moss and McIntyre] as it maintains an internal affairs department empowered and encouraged to destroy evidence of police officer malfeasance.

82.    Due to having been relieved of their duties on account of criminal involvement in child pornography, illegal drug use, and various other crimes of moral turpitude, at least four different officers have held the role of supervisor/ Chief of the Florence Police Department Internal Affairs division over the last five years or so.  Due to this clear lack of continuity at the helm of Internal Affairs, the practice of destroying complaints of police officer misconduct is not only deliberately indifferent to the well-being of those who might encounter these officers at a later time, but is also clearly a self-serving practice intended to shield the City of Florence as well as Florence Police Department officers for liability for their misconduct.

83.    At the time that the allegations in this complaint occurred, no Florence Police Department officer had ever been disciplined on account of misconduct reported to the Internal Affairs division, an interesting statistic given the fact that the Florence Police Department is approximately one-hundred officers strong.

84.    Employees of the City of Florence who would be considered the final policy-makers for the Florence Police Department are familiar with Internal Affairs' practice of destroying reports of police misconduct.  These final policy-makers know that such a practice could only hold police officers less accountable for their misconduct, and only increase the potential for citizens to experience abuse at the hands of the

police officers.

      85.    Plaintiff believes that the violation of his rights by Officer's [sic] McIntyre and Moss would not have taken place were it not [for] the impotent and corrupted state of the Internal Affairs division.[148]

Essentially, plaintiff seeks to hold the City liable for the constitutional violations allegedly committed by McIntyre and Moss.  Because the court already has found that McIntyre and Moss did not commit violations, or that they at the very least are entitled to qualified immunity from plaintiff's claims, there is no basis for holding the City liable.  Summary judgment is due to be granted on plaintiff's claim against the City of Florence.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, all motions for summary judgment are GRANTED, and all of plaintiff's claims against all defendants are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 17th day of December, 2012.

_____
United States District Judge

---

[148] Amended Complaint ¶¶ 81-85 (alterations supplied).